IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2006

## STATE OF TENNESSEE v. RICHARD BARROM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08316     James C. Beasley, Jr., Judge**

_____

### No. W2005-01596-CCA-R3-CD  - Filed July 28, 2006
_____

Following a jury trial, the defendant, Richard Barrom, was convicted of assault by causing extremely offensive or provocative physical contact, a Class B misdemeanor. The trial court deferred sentencing, placed the defendant on diversion for eleven months, twenty-nine days, and ordered him to perform thirty hours of community service work and complete an anger management program. On appeal, he argues that: (1) the evidence is insufficient to support his conviction; (2) the trial court erred in overruling his objection to hearsay testimony; (3) the trial court improperly removed a juror based on race; and (4) his conviction was barred by prior jeopardy. Additionally, the State argues that the trial court erred by granting judicial diversion. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

C. Michael Robbins (on appeal) and Ted Hansom (at trial), Memphis, Tennessee, for the appellant, Richard Barrom.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; and Lance E. Webb, Assistant District Attorney General Pro Tem, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant in this case is a Memphis police officer and his conviction is the result of his conduct toward the victim, an Allright Parking lot attendant, on November 9, 2001, following a dispute about the parking privileges of the defendant's wife. The defendant was subsequently indicted for Class A misdemeanor assault by causing bodily injury (Count 1) and Class B

misdemeanor assault by causing extremely offensive or provocative contact (Count 2). Count 2 was *nolle prosequied*, and the jury convicted the defendant of the lesser-included offense of assault by extremely offensive or provocative contact in Count 1.

## State's Proof

Annetta Jackson testified that she was employed as a clerk's aide in the District Attorney General's office located in the Criminal Justice Center at 201 Poplar Avenue in Memphis. Shortly after 8:00 a.m. on November 9, 2001, while taking a coffee break outside her office "[o]n the Washington [Avenue] side," she overheard a conversation between a pregnant woman and the parking attendant, Danny Coleman, at the Allright Parking lot across the street. The woman told Coleman that she wanted to place her $5 parking fee "in the slot" in the metal box, rather than give it directly to him. Coleman informed the woman, who appeared agitated, that it was his job to collect the $5 and that if she did not pay it, a barrel would be placed on her car. Jackson said she did not see the woman give any money to Coleman, and if Coleman had "said something out of the way" to the woman, she could have heard it. About ten minutes later, she saw the defendant come from across the street and walk up behind Coleman. The defendant, using a raised voice and standing "[n]ose to nose" to Coleman, said, "You don't talk to my mother fucking wife like that. . . . She's pregnant." Coleman backed up, but the defendant "kept getting in his face." Coleman told the defendant, "I didn't say anything. She has to pay me. That's why I'm out here." The defendant then pushed Coleman with both hands and "got into a Kung Fu mode, . . . and he just went to kicking at [Coleman] and cursing him, pushing him." Jackson saw the defendant strike Coleman three times, "[m]aybe more." A "white man" tried to break up the fight, but the defendant pushed him, so the man "just threw his hands up" and walked away. Jackson said the defendant kicked Coleman and "knocked him down to one knee." She said the defendant was wearing glasses which never came off but were "hanging . . . on one side" after the defendant hit himself. Several police officers responded to the scene and "jumped" on Coleman. As Coleman was trying to get up, "a female officer . . . had him down with a stick across his throat." She said the victim was transported by ambulance from the scene and the defendant "[s]tarted walking off." Jackson said at the time she did not know that the defendant was a police officer and he did not identify himself as such when he walked up to Coleman.

On cross-examination, Jackson testified that Coleman was wearing an Allright Parking shirt, long pants, and a bandana and hat on his head that day. She acknowledged that when the woman refused to give her money to Coleman, he raised his voice to her and said, "You have to give me the $5. That's why I'm standing here." She said Coleman never swung at the defendant although she told the police in her statement that Coleman did swing at him, explaining that Coleman was "[p]rotecting himself."

Ralph Rosen testified that he had just gotten out of his truck in the parking lot when he heard "some yelling, screaming" and saw the victim and the defendant arguing. He said the defendant "looked pretty pissed" and told the victim "he'd beat him down, and he went on to say that he would kill him." Rosen then saw the victim and the defendant pushing each other and the defendant kick

the victim in the left hip. The victim "kind of stepped back . . . took his natural defenses and kind of stood his ground." Rosen said he stepped between the victim and the defendant to try to diffuse the situation. However, the two men continued to curse each other, and the victim reached around Rosen's back and slapped the defendant, knocking the defendant's glasses off in the process. Rosen then stepped back and decided to "let them have at it." He estimated the altercation lasted "[a]t the most maybe two or three minutes" and said the defendant told the victim, "I'm going to fucking kill you," several times during the confrontation. Rosen said he did not know that the defendant was a police officer until he separated the defendant and the victim and noticed the words "Memphis Police Department" on the defendant's "white polo shirt." Asked if he noticed a mark or scratches on the defendant's face, Rosen replied, "Briefly I did just where like the nosepiece of the glasses would have been, and something would have hit him."

Carolyn Mosby testified that she witnessed the altercation between the defendant and the victim and heard the defendant tell the victim, "I'll kick your fucking ass. . . . I'll fucking kill you. . . . My wife is fucking pregnant. You don't fuck with my wife." The defendant then kicked the victim and told the victim "to hit him back." The victim told the defendant, "Get up out of my face." The defendant kicked the victim "like he was a trained judo fighter" about ten times, but the victim never struck the defendant. She saw Rosen try to separate the defendant and the victim but denied that the victim reached around Rosen and struck the defendant. She said that after Rosen tried to separate the two men and after the defendant had kicked the victim several times, the defendant "knocked his own glasses off when he was jumping back." She said the defendant was not in uniform and never identified himself as a police officer. She said the victim was wearing "a parking lot attendant outfit, blue with red writing on it" and the defendant was wearing "street clothes . . . khakis and a t-shirt with a orange stripe around the collar." She said the defendant was not injured during the altercation, but the victim was lying on the street rubbing his leg.

The victim, Danny Coleman, testified that he was working as a parking attendant at the Allright Central Parking Lot located at Third and Washington Streets on November 9, 2001. He explained that his job duties included collecting money from customers and placing a ticket on their cars and said the appropriate time for customers to place their money in the metal box was when he was not working. After parking her car in the lot, the defendant's wife approached the pay meter and Coleman, who was dressed in his work uniform, told her she had to pay him. Coleman said Mrs. Barrom did not want to pay him "because she thought I was scheming trying to take her money. . . . She thought I was a con artist maybe." Coleman showed her his identification badge, and Mrs. Barrom told him she had already put three dollars in the pay meter. Coleman told her she could put the rest of her money in the pay meter and "didn't give her a hard time" because she was pregnant. However, Mrs. Barrom did not put any money in the meter; instead, she tore a piece of paper off the folder she was carrying, wrote down Coleman's name from his identification badge, told him she was going to tell her husband that he had hassled her with parking, and left. Coleman said he paid Mrs. Barrom's $5 parking fee and placed a ticket on her car. He denied that he told Mrs. Barrom her car would be towed or that a barrel would be placed on it.

Coleman testified that, about ten to fifteen minutes later, the defendant approached him with the same sheet of paper that Mrs. Barrom had written his name on, asked him what his name was, and said, "If you ever give my pregnant wife a hassle parking again, I'm going to fucking kill you." The victim tried to tell the defendant that Mrs. Barrom did not want to pay him and that he did not hassle her. The defendant responded, "I don't want to hear that" and pushed the victim to the ground. The victim stood up and told the defendant he was not going to fight him because he did not want to lose his job. The defendant kicked him in the left hip and "was like a raging bull basically." The victim asked the defendant why he was kicking him, and the defendant kicked at him again. At that point, Rosen got between the victim and the defendant, but the defendant "kicked around" him. While trying to keep the defendant away from him by putting his arms out, the victim accidentally knocked the defendant's glasses off his face. When the defendant refused to stop, Rosen gave up and returned to his truck. The victim said the defendant actually kicked him four times but kicked at him more than ten times. He denied that he had threatened or provoked the defendant.

The victim said that the defendant was wearing "a white or a cream-colored polo shirt [and] "some cream-colored, jeans, khakis." Asked if the defendant's shirt had "Police" written across it, the victim replied, "It probably did. I don't know. I just really wasn't paying no attention. It may have did." However, the victim acknowledged that in his statement to the police after the incident, he had said the defendant was wearing a white polo shirt with "Police" written across it. He denied that any officers threw him to the ground when they arrived at the scene.

The victim said his injuries consisted of a bruised and swollen hip for which he was prescribed pain medication. He also missed eight or nine days of work and was subsequently terminated. The victim said that he was five feet, eight inches tall and weighed about 135 or 140 pounds at the time of the altercation.

Tiffany Green, a dispatcher for the Memphis Police Department, testified that she was at work on the twelfth floor of the Criminal Justice Center and that she could see the Allright Parking lot from the windows in her office. After hearing someone say, "They're fighting," she looked out a window and saw "a male black" and the defendant fighting and a man wearing a blue shirt trying to break up the fight. After the man in the blue shirt was unsuccessful in stopping the altercation, "the male black" pointed his finger in the defendant's face, and the defendant kicked him in "the middle-torso area" three times. Using her binoculars, she saw that uniformed police officers had arrived at the scene and were taking a "male black into custody."

Sergeant Gwendolyn Terry-Cook of the Memphis Police Department testified that she responded to a "fight call" at the corner of Washington and Third Streets between 8:30 and 9:00 a.m. The defendant, whom she knew, was the only officer on the scene when she and her partner, Celestina Moss, arrived. She said the defendant and the victim "were in a face off" but were not touching each other. She and her partner put the victim on the ground, and "the people in the crowd started yelling that [they] had the wrong guy." The defendant told her that his wife had parked in the lot and the victim had cursed her. The defendant said that while he and the victim were "having words," the victim walked into his "personal space." The defendant told Sergeant Terry-Cook that

he had pushed the victim out of his personal space, and the victim "came back into his personal space and that's when [the defendant] pushed him and struck him." She said the defendant did not appear to be injured, but he told her that his glasses had been broken during the scuffle. The victim "was crying and complaining of pain" and was transported by ambulance to a hospital.

Sergeant Greg Sanders of the Memphis Police Department testified that he was assigned to the Security Squad of the Inspectional Services Bureau on November 9, 2001, and that the function of the squad was to handle complaints against police officers. His inspector informed him that the defendant had been involved in an altercation at the Allright Parking lot and requested that he go to the scene. When he arrived, medical personnel were preparing to transport the victim and several police officers were already present. Sergeant Sanders said the defendant's wife, a patrol officer, also came to the scene. The defendant told Sanders that his glasses had been knocked off during the altercation, and photographs were taken of the glasses, as well as the victim's jacket and cap which were on the ground. Sanders said the defendant "had a speck of blood somewhere on his face," but he did not see any blood on the ground.

### Defense Proof

Kimberly Barrom, the defendant's wife and a Memphis police officer, testified that at the time of the incident she was four months pregnant and was working in the Information Technology Department located in the Criminal Justice Center. When she arrived for work on November 9, 2001, she parked her car in the Allright Parking lot and did not see an attendant although there was usually an attendant present. After she had placed three of her five one-dollar bills in the meter box, she heard the victim yelling at her, "Why you-all mother fuckers always fucking with me?" Mrs. Barrom tried to give the victim her other two dollars, but he would not accept it, so she put it in the box. She said the victim "kept getting madder" and refused to give her a receipt for her parking fee. The victim told her, "This is my mother-fucking lot. I can do anything I want to on my mother-fucking lot. I'll do anything I want to, to these mother-fucking cars while they're on my mother-fucking [lot]." She asked the victim for his name and wrote it down after he showed her his identification card. She called and reported the incident to Mary Marino at Allright Parking. She then told her mother, who also worked in the Criminal Justice Center, about the incident, and her mother telephoned the defendant. Mrs. Barrom told the defendant what had happened and that she was concerned about her car being towed. She said she was extremely upset and fearful during the incident with the victim.

On cross-examination, Mrs. Barrom said she did not remember if the victim had been wearing an Allright Parking uniform. She agreed that the victim's behavior toward her constituted disorderly conduct, but she did not issue a citation to him. Mrs. Barrom said she took the victim's comment that "he could do anything he wanted to on his lot" as a threat, and she filed a complaint with the police department four days later.

The defendant testified that he graduated from the police academy in 1989 and that he was a member of the Army National Guard where he had received training in self-defense techniques.

Regarding martial arts training, the defendant said he possessed a yellow belt in Taekwondo. He said that, on November 9, 2001, he was assigned to the Homicide Squad of the Memphis Police Department located on the eleventh floor of the Criminal Justice Center. He said he was allowed to wear casual attire on Fridays and had done so on November 9. He identified the shirt he wore that day and said it had been in a sack in his closet and had not been inspected by an investigator. He said his shirt was torn during the altercation with the victim.

The defendant said that, on the day of the incident, he received a telephone call from his mother-in-law and then spoke to his wife whose voice was "trembling." After his wife told him that the victim had threatened to tow and put a barrel on her car, he left his office to go move her car and get the supervisor's information of the individual who had upset his wife. The defendant said he was not wearing his badge and did not have his gun with him when he went to the parking lot. He asked the victim for the name of his supervisor and if he had "curse[d] a pregnant lady on this parking lot." The victim replied, "No, I did not curse that pregnant white lady." The defendant informed the victim that the "pregnant white lady" was his wife and the victim "closed up and put his chest up against [the defendant's]." The defendant said that the victim's chest was touching him and that the victim's demeanor had been "escalating with every question asked." The defendant then pushed the victim away with his hand and told him to stay away. The victim "came right, right back up against [the defendant's] chest." The defendant pushed the victim away again, stepped back, held up his hands and said, "Stay out of my face," using "a command voice." The victim then knocked the paper and pen from the defendant's hands, pushed the defendant, "got back up in [the defendant's] chest," "mumbled something," and said he did not want to lose his job. The defendant pushed the victim away, and the victim came toward the defendant with a "balled up" fist. Because he believed the victim was going to hit him, the defendant kicked him in his hip area. He explained that he kicked him instead of using his fists because he had been taught to neutralize a threat by kicking, rather than fist-fighting. The victim then pulled his hat and jacket off, balled up his first, and "came right back to [the defendant]." Rosen intervened and stepped between the defendant and the victim, saying, "Hold. Hold." The defendant told the victim, "You're going to jail buddy," and the victim reached across Rosen's left shoulder and punched the defendant, knocking his eyeglasses to the ground. After the victim struck the defendant, Rosen stepped aside and the defendant told the victim to "[b]ack off." However, the victim came at the defendant again, and the defendant kicked him in the thigh area. The defendant said he kicked the victim four times during the altercation and the entire incident lasted "no more than five minutes." The defendant said he had scratches on both wrists and blood on his nose. He said that the victim used profanity "a couple of times" and that it was likely he had done so as well. Asked if he had threatened to kill the victim, the defendant said, "I know that during the initial confrontation before Mr. Rosen stepped in, I did not, absolutely did not, but after he punched me in my face and I got angry, I very well might have. I don't know." He said that all of the physical contact he had with the victim was in self-defense.

On cross-examination, the defendant acknowledged that he never identified himself as a police officer to the victim. The defendant said he was six feet, two inches tall and weighed about 240 pounds at the time of the incident. He estimated the victim's height as five feet, eight inches and his weight at about 180 pounds at the time. He acknowledged that he was several inches taller

and at least sixty pounds heavier than the victim. The defendant maintained that the victim "presented a threat. He kept presenting himself into my personal space. He kept acting aggressively."

Amy Sullivan, a dispatcher for the Memphis Police Department, testified that she was at work on the twelfth floor of the Criminal Justice Center and saw, from the windows in her office, the victim strike the defendant and the defendant then push the victim. The victim came at the defendant again, and the defendant pushed him and kicked at him. She sent out a broadcast over the radio to alert officers to the scene and identified an event chronology of the incident which reflected that the broadcast went out at 8:38.35 a.m. and that the first officers arrived on the scene at 8:38.37 a.m. On cross-examination, she acknowledged that what she had witnessed may not have been the first contact the defendant and the victim had with each other.

Scott Alexander Tucker, a dispatcher for the Memphis Police Department, testified that he witnessed the altercation from the windows in his twelfth floor office. He said the defendant and the victim appeared to be "going off on each other yelling, . . . hollering." He saw a man wearing a blue shirt trying to separate the defendant and the victim, but the man got "fed up with it and said forget it." He described what he saw next: "The [defendant] took like a stance position like to defend himself, and then the [victim] came at him, and he just took his foot and just kicked him right around the middle of the chest. He just sort of doubled over and that was about it. That was the confrontation that happened that I saw."

Officer Daniel Jacobs, a bicycle officer with the Memphis Police Department, testified that when he arrived at the scene, the victim was lying on the ground and he observed a "gash," which he described as "[a] cut, a wound, an opening" on the defendant's nose. To Officer Jacobs' knowledge, the victim was never arrested.

Lieutenant Tracy Gossett of the Memphis Police Department testified that she was a sergeant in the Homicide Bureau on November 9, 2001, and worked with the defendant, whom she had known for about seventeen years. She described the defendant as "a very truthful person." On the morning of the incident, she looked out her office window and saw the defendant and the victim in "some sort of scuffle in the parking lot." She went to the scene and saw that the defendant had "a red abrasion as though he'd be[en] struck in the face" and "some scratches on his arms." On cross-examination, Lieutenant Gossett acknowledged that she only saw the end of the altercation as it was being broken up by other officers.

Sergeant Nathan Berryman of the Memphis Police Department testified that he had known the defendant for about fifteen years and considered him a friend. He described the defendant as "honest" and "one of the most stand-up, straight-up kind of guy I've ever met. . . . [Y]ou can trust him with a million dollars."

Officer Tameko Fields of the Memphis Police Department, called by the State as a rebuttal witness, testified that she responded to the scene and because "the call went out as [an] officer

involved in a fight with a possible armed party," she grabbed the victim by the arm and told him to get on the ground. She recognized the defendant as a police officer from the shirt he was wearing which bore a police emblem. The defendant never told her that he had placed the victim under arrest. When she arrived, the defendant and the victim were standing "toe to toe" with their arms at their sides. She did not see the defendant and the victim exchange any blows or push each other.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain his conviction. Specifically, he argues that "[s]ince the jury found the defendant not guilty of an assault by knowingly causing bodily injury; and, further, the evidence was uniformly to the effect that the defendant caused bodily injury, the evidence is insufficient as a matter of law to sustain a conviction of the B misdemeanor assault proscribed by Tenn. Code Ann. § 39-13-101(a)(3)."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of Class B misdemeanor assault, which occurs when a person "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a)(3). Relying on State v. Smiley, 38 S.W.3d 521, 525 (Tenn. 2001), the defendant argues that his physical contact with the victim was not extremely offensive or provocative.

Viewed in the light most favorable to the State, the proof at trial established that the defendant, angered by the victim's conduct toward his pregnant wife, left his workplace and went to the parking lot where the victim worked. There, the defendant and the victim engaged in a heated dispute, and the defendant cursed and threatened to kill the victim, pushed the victim, and kicked him four times. Based on this evidence, we conclude that the jurors reasonably could have determined that the defendant's actions toward the victim satisfied the elements of Tennessee Code Annotated section 39-13-101(a)(3).

## II. Admission of Sergeant Terry-Cook's Testimony

The defendant next argues that the admission of Sergeant Terry-Cook's testimony that people in the crowd at the scene shouted to the police that they "had the wrong guy" when the officers took the victim to the ground "necessarily implies that the aggressor in this conflict was the defendant." At trial, the defendant objected to this testimony as hearsay, and the following exchange occurred during a bench conference:

> [DEFENSE COUNSEL]: I'm going to move to strike the comment from the record regarding the crowd and the comment as hearsay, obviously, and ask that it be stricken from the record and the jury be instructed.
>
> [THE STATE]: Judge, it's not being offered to prove the truth of the matter. It's just being offered to show why she acted the way she did.
>
> THE COURT: I'm going to overrule your objection, [defense counsel]. I think that's proper comment, and I think I'll allow it under those circumstances.
>
> [DEFENSE COUNSEL]: May I respond only that even if the Court feels that it was in some way relevant to this, I think 403 would indicate that it should be excluded.
>
> THE COURT: Well, I think there's already been testimony to this effect from other witnesses who've already testified that when the officers arrived, what occurred, and they were telling the officers they had the wrong person. So I think it's – I'm going to allow it. I think it's proper.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid.

801(c). "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions as to the admission of evidence generally lie within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999).

To place this matter into context, we note that, earlier in the trial, Annetta Jackson had testified that the defendant had come up behind the victim, cursed him in a raised voice, pushed him with both hands, kicked him, and knocked him to one knee. Ralph Rosen testified that he had seen the victim and defendant pushing each other, and the defendant kicked the victim, who slapped the defendant, knocking off his glasses. During the encounter, the defendant several times told the victim, "I'm going to fucking kill you." Carolyn Mosby testified that, although the victim did not strike the defendant, the defendant kicked the victim several times and knocked off his own glasses. As for specifics of the incident, Tiffany Green said that she saw the victim point his finger in the defendant's face, who responded by kicking the victim three times. Thus, by the time the jury heard some in the crowd shout that officers "had the wrong guy," as they had arrived and taken the victim to the ground, there already was abundant testimony that the defendant had angrily confronted the victim and loudly cursed, pushed, and kicked him. Thus, we conclude that even if the trial court abused its discretion in allowing this short statement, the error was harmless in view of other testimony from different witnesses to the same effect.

### III. Removal of Juror Williams

The defendant argues that the trial court improperly removed Juror Martha Williams on the basis of race,[1] saying "the responses of Ms. Williams to the questions of the trial court revealed no basis for removal for cause."

After the proof was presented, but before closing arguments and jury instructions, a deputy informed the trial court that Juror Williams had told him that she had been robbed at gunpoint the previous night and that her son was a Memphis police officer. The trial court explained its concern:

> My concern is first of all, she's been a victim of an armed robbery what kind of frame of mind she's in. Now, she didn't say anything this morning, but she's obviously said something to [the deputy] as they're leaving. So that was my chief concern. The other came, as he put it, Page 2 of the conversation, and so that I thought needed to

---

[1] Although not explicit in the record, it appears that the defendant and Juror Williams are white and the victim and the robber of Ms. Williams are African-American.

be brought to you-all's attention. My concern is her emotional state after having someone put a gun in her face and rob her.

The trial court then conducted voir dire examination of Juror Williams, and she informed the court that she had worked at a credit union for twenty-two years and had been "through several robberies" which would not affect her ability to go forward with the case. She acknowledged that her son is a Memphis police officer and said that would not affect her ability to hear the case and that she could judge the police officers' credibility like anyone else. The prosecutor then informed the trial court that the man who had robbed Juror Williams was African-American. The court made the following findings:

> Well, I'm going to do this because I have a concern. First of all, I have an extra juror, and that's the whole purpose of me having an alternate. I have a juror who's been the victim of an aggravated robbery. I am in the midst of trying a member of the Memphis Police Department, and I have many Memphis Police Department witnesses that have been testifying. I am just now finding out that she has a son who's a member of the Memphis Police Department.

> Even though she expresses no concern, no problem with going [f]orward with the trial and can still indicate that she can be fair and impartial, I have a real question of the standpoint of whether that's the case or not. . . .

> I'm going to excuse her, gentlemen. I'm . . . going to take the position that I think that that's too close a call, and I've got an alternate, and there's no reason in running any kind of risk of any kind of problem. . . . [I]t disturbs me, and it bothers me, and since I've got an alternate and it's not going to affect my ability to go forward with the trial, and we all agree on the other thirteen, and I don't know whether she would have been selected as the alternate or not.

> She's not the designated alternate, but we have no designated alternate. So she could have been designated as the alternate and with the problems that have arisen, I'm going to excuse her, and we're going to [go] forward with the remaining twelve.

Although the defendant seeks to cast the removal of Juror Williams at least partially in a racial light, we respectfully disagree that this was the case. The trial court explained that the concern was for "her emotional state after having someone put a gun in her face and rob her." Thus, we conclude that the trial court did not abuse its discretion in excusing the juror because of her traumatic experience the evening before. See State v. Mickens, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003).

-11-

## IV. Conviction Barred by Prior Jeopardy

The defendant argues that when Count 2 was *nolle prosequied*, the offense alleged in Count 2, assault by causing extremely offensive or provocative contact, was no longer before the jury. Citing State v. Rush, 50 S.W.3d 424, 432 (Tenn. 2001), he contends that because the jury acquitted him of assault by knowingly causing bodily injury as charged in Count 1, he "may only be retried for 'any offenses which qualify . . . as lesser-included offenses of . . . (assault by knowingly causing bodily injury) that were not originally charged; or . . . were charged but which are lesser offenses than (assault by extremely offensive or provocative physical contact).'"

As we understand this argument, it is premised upon the defendant's belief that the offense of which he was convicted, Class B misdemeanor assault by extremely offensive or provocative physical contact, is not a lesser-included offense of the charge for which he was indicted, Class A misdemeanor assault resulting in bodily injury. He cites no authorities for this proposition and we conclude that, in fact, the contrary is true. See Smiley, 38 S.W.3d at 525. Additionally, the defendant's argument assumes that this court will reverse his conviction and order a retrial. However, since we affirm the conviction, there will not be a retrial of the charges.

## V. State's Issue Regarding Judicial Diversion

The State argues that the trial court erred by granting judicial diversion, saying that the defendant was not a suitable candidate for diversion and that the ends of justice and the best interests of the public strongly favor denial of diversion.

Tennessee Code Annotated section 40-35-313 provides that, following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who pleads guilty or is found guilty of a misdemeanor or Class C, D, or E felony; has not been previously convicted of a felony or a Class A misdemeanor; and is not seeking deferral for a sexual offense or a Class A or B felony. Id. § 40-35-313(a)(1)(B). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b). The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). As such, it will not be disturbed on appeal absent an abuse of discretion. State v. Turco, 108 S.W.3d 244, 246 n.5 (Tenn. 2003). To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court considers (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial, and how those factors outweigh other factors in favor of diversion. Id.

In granting diversion to the defendant, the trial court stated:

I have considered the circumstances surrounding the case. The circumstances under which [the defendant] acted. I have considered [the defendant's] lack of record. [The defendant's] lengthy employment and work history as a member of the Memphis [P]olice [D]epartment. I believe that there's every indication to believe that [the defendant] is not the kind of an individual that's going to continue to violate the law.

It appears to the Court based upon the testimony that was produced at trial that [the defendant], in my opinion, overreacted to a circumstance . . . . [The defendant] reacted not as a police officer should react, maybe as an irate husband would react. But be that as it may, it was still not proper whether it [was] as an irate husband or as a police officer. In this Court's opinion he overreacted and he reacted in a way that was not only unprofessional but illegal. And I think the consequences that [the defendant] has suffered as a result of this are great. But it is a result of his own actions. And I find that [the defendant] is a person that I do not anticipate having problems with or anticipate that we will see down here again. And I do find based upon all of those factors that he is a proper candidate to [] be considered for diversion. I will therefore divert his sentence for a period of eleven months and twenty-nine days.

. . . .

Divert it for eleven months and twenty-nine days. I am going to require that [the defendant] perform thirty hours of community service work during that time period. And I'm also going to require that he complete an anger management program. I think that [the defendant] has some issues that need to be addressed.

It is obvious that this case was well tried by both sides. The trial court had considerable evidence before it, both from the trial and as additionally contained in the record. The court gave thorough and careful consideration to the question and concluded that the defendant was an appropriate candidate for judicial diversion. The record easily supports this determination.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE